**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, <br><br>   Plaintiff, <br><br>     v. <br><br> SHUTTERSTOCK, INC., a corporation, <br><br>   Defendant. | **Case No. 26-cv-3955** <br><br> **COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF** |

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), for its Complaint alleges:

1.      The FTC brings this action for Defendant's violations of Section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), and the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8401 *et seq.*, in connection with the sale of its stock images and other content on Defendant's platform. For these violations, the FTC seeks relief, including a permanent injunction, monetary relief, and other relief pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b), 57b, and Section 5 of ROSCA, 15 U.S.C. § 8404.

**SUMMARY OF THE CASE**

2.      Defendant Shutterstock, Inc. maintains one of the world's largest online libraries of stock photos, graphics, videos, and music clips that consumers can pay to license for their own use. Since at least 2020, Defendant has offered most of its content through a subscription model that consumers enroll in via the Internet.

1

3.      For years, Defendant has misled consumers about its subscription plans, many of which have complicated and onerous terms that Defendant deceptively presents as simple. For example, Defendant promotes its "annual, paid monthly" plan ("APM" or "APM plan") as a simple arrangement of limited duration. This straightforward promotion fails to disclose the APM plan automatically renews. Consumers who are surprised by the APM's terms and try to cancel it find, for the first time, that Defendant charges a substantial cancellation fee, which Defendant likewise fails to adequately disclose. Moreover, for years, Defendant offered consumers a "free trial," but failed to adequately disclose that it automatically converted into an APM plan with a hefty cancellation fee.

4.      Defendant also fails to provide simple mechanisms to cancel its APM plans, employing a series of obstacles to deter and prevent consumers from stopping recurring charges. These obstacles have included long wait times for phone cancellation, multiple follow-up steps for email cancellation, and multipage online cancellation flows.

5.      Defendant also sells on-demand "packs" of a finite number of downloads of stock images and other content. Defendant advertises these packs as perfect for a "one-time project," but buries any mention that it automatically charges consumers for an additional pack when the last download in the pack is used. And, for years, Defendant sold the packs without adequately disclosing that they automatically renewed after one year, even if there were downloads left in the pack.

6.      Defendant knows its "users are confused about [its subscriptions'] terms and conditions" and was consistently warned by employees to "[c]learly communicate important terms and conditions." In discussing the Department of Justice's lawsuit against Adobe for similar subscription practices, Defendant's employees believed "people will come for

[Shutterstock] next." But Defendant continued with its deceptive conduct and, in the words of one manager, "hope[d] we can get away with it."

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PLAINTIFF

9.      The FTC is an agency of the United States Government created by the FTC Act, which authorizes the FTC to commence this district court civil action by its own attorneys. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces ROSCA, 15 U.S.C. §§ 8401-05, which, *inter alia*, prohibits the sale of goods or services on the Internet through negative option marketing without meeting certain requirements for disclosure, consent, and cancellation. A negative option is an offer in which the seller treats a consumer's silence – *i.e.*, their failure to reject an offer or cancel an agreement – as consent to be charged for goods or services. 16 C.F.R. § 310.2(w).

## DEFENDANT

10.     Defendant Shutterstock, Inc. is a Delaware corporation with its principal place of business at 350 Fifth Avenue, 21st Floor, New York, New York 10118. Defendant transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, Defendant has advertised, marketed,

3

distributed, or sold subscriptions to its products and services to consumers throughout the United States.

## COMMERCE

11.     At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

### I.     Defendant's Negative Option Offerings

12.     Defendant operates an online platform that maintains a library of stock photos, graphics, videos, and music clips that consumers pay to license for their own use. Defendant offers most of its content through a subscription model where consumers can download up to a specified number of pieces of content, such as ten images per month, and retain a license to use that content for a specified period of time.

13.     Defendant offers consumers several plans for licensing image, video, and music content on its website: annual subscriptions; month-to-month subscriptions; and on-demand "packs." Defendant's annual subscription offerings include the APM plan, in which consumers pay monthly over the course of a year or an annual, paid upfront ("APU") plan, in which consumers pay the total amount upfront. All these subscriptions automatically renew unless cancelled by the consumer.

14.     Defendant's subscriptions vary from a handful of downloads per month to hundreds of downloads per month and vary in price from $29 per month to $199 per month for image plans, $49 per month to $69 per month for music plans, and from $299 per year to $199 per month for video plans.

15.     All content downloaded comes with a license that determines how the content can be used. Defendant offers both a standard and an enhanced license for its content which governs how many times content can be used.

## II.     Defendant's Unlawful Subscription Enrollment Practices

16.     Consumers subscribe to Defendant's products via the Internet by going to Shutterstock.com directly or by clicking on advertisements that lead to Shutterstock.com and then navigating to the page of the product to which they want to subscribe, also known as an enrollment "flow."

17.     However, as explained below, in its enrollment flows, Defendant deceptively markets several of its products, including the APM plan and on-demand "packs."

### A.  Defendant Fails to Disclose Key Terms of its Annual, Paid Monthly Plans

18.     Consumers who enroll on the desktop website are first taken to a plan selection page. On the plan selection page, Defendant offers subscriptions of different license quantities, terms, and payment terms, as shown in Figure 1 below.



Figure 1 *(Depicting plan selection page available on desktop from March to December 2022)*

19.     In offering the APM plan, Defendant promotes the monthly terms of its APM plans. For example, as shown in Figure 1, from March 2022 until December 2022, Defendant first touted its APM plan as its "Best Value" and a "sweet deal" before prompting consumers to choose the number of "Downloads per month." Based on the consumer's selection, Defendant then displayed a monthly price.

20.     Specifically, since at least 2021, the plan selection page of Defendant's desktop APM enrollment flows frequently has failed to clearly and conspicuously disclose material terms of the APM plans. For instance, Defendant has failed to adequately disclose to consumers on its

plan selection page that the plan automatically renewed at the end of each year and that Defendant charged a fee to cancel the APM plan before the end of the term.

21.    In order to find additional information on the plan selection page related to the APM plan's automatic renewal and cancellation fee terms, consumers would have to scroll all the way to the bottom of the plan selection page where Defendant presented ten frequently asked questions ("FAQs"). The consumer would then need to click, expand, and read all ten of these FAQs individually to learn more. Defendant did not require consumers to view these FAQs prior to completing the enrollment process.

22.    From March 2024 to the present, Defendant has changed the enrollment flows it presents to consumers but Defendant nevertheless still fails to disclose multiple material terms of its APM offerings. Since these changes, the plan selection page has presented two different sets of negative option offerings side by side, as shown in Figure 2 below. On the left side, Defendant presents its "pack" offerings, which are discussed further in Section II.B within. On the right side, Defendant presents its "Subscribe and Save" offerings which include the APM plan. Defendant's enrollment flows do not differ materially and each of the plans' enrollment flows begin with a plan selection page that presents available subscriptions and their prices, including the one shown in Figure 2 below.



Figure 2

23.　　On this plan selection page, Defendant sets the APM plan as the default and prompts consumers to click a brightly colored "Buy now" button. However, Defendant does not disclose to consumers that the APM plan will automatically renew at the end of the year if consumers do not cancel. Defendant also does not clearly and conspicuously disclose that it will charge consumers who cancel before the end of the year a cancellation fee, or the amount of that fee.

24.　　Rather, the very bottom of the plan selection box includes an inconspicuous line of text in a less prominent location than the price, number of downloads, and other disclosed terms of the APM plan, that states, "Cancellation fee applies. See terms & conditions," which the consumer cannot view without clicking a hyperlink.  Defendant also displays much of this text in

a light gray font, which is easy to miss as it is less distinct than the bold text and brightly colored button elsewhere on this enrollment screen.

25.    Consumers are not required to click the hyperlink or acknowledge that they read the hyperlinked document. Consumers who do click on the link are directed to the Shutterstock License Agreement, including its Terms of Service. But even in the Terms of Service, Defendant does not disclose that the APM plan will automatically renew and does not clearly and conspicuously disclose that the APM plan is subject to a cancellation fee, or the amount of that fee.

26.    On the plan selection page, Defendant prompts consumers to click a "Buy now" button that is more prominently displayed and above the hyperlinked Terms and Conditions in the enrollment flow. Once consumers click the "Buy now" button, they are then prompted to enter their email address and a password. On the page on which consumers are prompted to enter their email address and password, Defendant makes no disclosures related to the APM plan's cancellation fee or automatic renewal.

27.    After entering their account information, consumers are taken to the final enrollment page where Shutterstock obtains their billing information as shown in Figure 3.



Figure 3

28.     On this final page, Defendant first obtains consumers' credit or debit card information and prompts consumers to click a brightly colored button labeled "Continue to billing address." Defendant then prompts consumers to enter their billing address and then to complete the transaction by clicking a button labeled "Complete checkout," which if clicked bills the consumer and commits them to an APM plan. Defendant not only fails to disclose the APM plan's cancellation fee or automatic renewal before obtaining consumers' billing information but also fails to disclose those material terms clearly and conspicuously.

29.     On this final page, only in small, unclear, and inconspicuous font, below the "Complete checkout" button, and below disclosures of the price and some other terms of the selected APM plan, does Defendant include additional disclosures. These disclosures are in text that is smaller and less distinct than the brightly colored buttons that Defendant uses to prompt consumers to navigate this page and complete enrollment. Thus, consumers can, and do, enroll without ever reading the inconspicuous disclosure. This disclosure states:

> *Image Annual Billed Monthly Subscription – 10 Downloads Per Month. Standard License

> By signing up for an annual subscription plan, you agree that Shutterstock will automatically charge $29 monthly until your subscription has expired. We will bill you monthly for 1 year. After that, your plan will be renewed for another 1 year commitment.

> If you cancel before the end of the 12 month term, you will be charged 50% of your remaining contract obligation unless local law requires otherwise.

This fine print paragraph includes the first and only mentions across the entire flow that the APM plan will be automatically renewed after one year. This fine print also does not include the word "fee" or phrase "Cancellation fee" and thus does not match the earlier inconspicuous reference to a "fee" for cancellation. Nor does this fine print clarify what is meant by "your remaining contract obligation" or the amount of the cancellation fee, which can vary from $29 to thousands of dollars depending on the subscription. Currently, Defendant charges an early cancellation fee equivalent to 50% of the consumer's remaining subscription cost.

30. Prior to January 2024, Defendant had numerous different versions of this fine print paragraph, all of which failed to adequately disclose the material terms of the purchase. Many consumers did not understand that there would be an early cancellation fee if they ended the subscription prior to the end of the subscription term.

31. On Defendant's mobile website, Defendant places its fine print disclosures after the screen where Defendant obtains consumers' payment and billing information and prompts them to click "Complete checkout." Additionally, the fine print disclosures do not appear on the mobile user's screen. To see the disclosures on Defendant's mobile website, the consumer must scroll all the way to the bottom of the page. But Defendant does not indicate on the billing information page that there are disclosures at the bottom of the screen. Thus, customers can and

do click "Complete checkout," complete a purchase, and enroll in a program with a negative option feature without the disclosures ever appearing on their screen.

32.     Defendant's enrollment practices related to its APM plans have generated frequent complaints from subscribers of the APM plan, including to the Better Business Bureau ("BBB"), to state law enforcement agencies, on social media, and to Defendant itself.

33.     Defendant's enrollment flows for its APU plans, both on the mobile and desktop websites, are similar to those for the APM plans. As with its APM plans, Defendant does not disclose to consumers, before obtaining their billing information, that its APU plans automatically renew, and further does not clearly and conspicuously disclose that its APU plans automatically renew.

34.     In their complaints, consumers have reported they did not understand what they were signing up for and were surprised to learn they were enrolled in a plan that automatically renews and that imposes a hefty cancellation fee. The cancellation fee and related confusion have been top drivers of customer support contacts, dissatisfied consumers, and consumer inquiry escalations to management at Shutterstock. Defendant knows about and has monitored numerous complaints received directly from consumers and from other sources like the BBB.

35.     Shutterstock employees have also internally acknowledged that Defendant's enrollment practices cause confusion and harm. Internal communications between managers or employees repeat that "many of [our] customers don't realize what they have signed up for…." For instance, in October 2023, a Shutterstock Operations Senior Manager of Customer Experience stated in a group chat that Defendant's cancellation fee was a "constant source of confusion/frustration for customers." Likewise, in December 2023, Defendant's Senior Product Manager noted that while Defendant had added a self-serve cancellation flow, it "still [has] the

12

issue of locking people into an annual commitment (they may not fully understand at sign-up), and then charging a fee to cancel." In March 2024, one employee told the former Director of Product, "it doesn't appear we even state that we have a cancellation fee policy during checkout." In June 2024, a Senior Product Manager noted that she didn't "blame [customers] as we weren't telling them in the purchase funnel" about the early cancellation fee.

36. Defendant is aware that the cancellation fee is a powerful retention tool. In May 2024, Defendant implemented the current cancellation fee policy and applied it retroactively. They implemented this change, which effectively raised the cancellation fee for all customers, without telling consumers who had signed up under the previous cancellation fee policy about the change. In the first week after the implementation of the current cancellation fee policy, Defendant saw a 70% reduction in the volume of users canceling early. The Chief Marketing Officer noted in an email that, while a higher cancellation fee results in less immediate cancellation fee revenue, it increases retention, which is "a win" over the longer term. As the Director of Growth and Strategy put it in January 2024, the cancellation fee "might be ugly but we need to find a way to drive this business up."

**B. Defendant's Unlawful Enrollment Flows for On-Demand "Packs" of Content**

37. Defendant offers on-demand "packs" of image and video content that allow consumers to download a set quantity of content within one year of purchase.

38. For both image and video on-demand packs, consumers also can select a "Standard License" or an "Enhanced License," and can choose from 3 sizes of packs, which range up to 25 images or videos. The packs range from $29 for 2 standard images to $2,669 for 25 videos with an enhanced license.

13

39.     Defendant advertises its packs as "Best for a one-time project." Defendant further assures consumers that packs allow them to "Get only what you need" because there is "No commitment." See Figure 4.



Figure 4 (*Advertisement from marketing email*)

40.     Prior to February 2024, these packs automatically renewed after one year, resulting in Defendant using the consumers' billing information to purchase yet another "one-time" pack. Defendant failed to clearly and conspicuously disclose this term of its packs.



Figure 5 (*Pack Plan Selection Page Mar. 2022-Dec. 2022*)

41.     From at least January 2020 to January 2024, the plan selection page did not include any reference to packs automatically renewing or automatically refilling. Consumers would see the on-demand pack options as shown in Figure 5 above or a similar plan selection page that lacked disclosures that the packs automatically renew or refill.



Figure 6 (*Current Video Plan Selection Page*)

42.    Currently, as shown on the left side of Figure 6 above, the plan selection page reiterates that the packs are "Ideal for creators with a one-time project" as shown in Figure 6 above. On this plan selection page, Defendant asks consumers to choose the number of "Downloads (within one year)." Based on the consumer's selection, Defendant then displays a specific price on the next screen.

43.    Defendant does not clearly and conspicuously disclose all material terms of the transaction, including that Defendant will automatically charge consumers who use the last download in their "one-time" pack for an additional pack. As shown in Figure 6 above, Defendant discloses only in smaller, inconspicuous gray text below the more prominent "Buy now" button, "Your pack will automatically refill when all licenses are used." Defendant does not explain what "refill" means. And Defendant's inconspicuous disclosure is unclear because it

contradicts Defendant's more prominent representation that packs are "Ideal for creators with a one-time project."

44.     Moreover, Defendant does not disclose on the plan selection page that, when consumers who purchase packs for a "one-time project" use the last download in the pack, Defendant charges the consumer's payment method on file for an additional pack. Defendant also does not disclose the amount of that additional charge, or how consumers avoid the "refill." Thus, consumers report being unaware Defendant charged them for another pack until they see the charge on their banking or credit card statement, often for hundreds or thousands of dollars.

45.     Upon clicking "Buy now," consumers who do not already have a Shutterstock account are prompted to enter their account information. On the page on which consumers are prompted to enter their account information, Defendant makes no disclosures related to the material terms of the pack.

46.     Consumers who enter their account information are then taken to the final page of the enrollment flow, shown in Figure 7 below, where Defendant obtains their payment and billing information.



Figure 7 (*Final Page of Enrollment Flow*)

47.     On this final page, Defendant first obtains consumers' credit or debit card information and prompts consumers to click a brightly colored button labeled "Continue to billing address." Defendant then prompts consumers to enter their billing address and then to complete the transaction by clicking a button labeled "Complete checkout," which if clicked bills the consumer and commits them to a pack. Defendant does not disclose, before obtaining consumers' billing information, that packs automatically refill or expire, that Defendant charges the consumer's payment method on file for an additional pack, the amount of that additional charge, or how consumers avoid such additional charges. Defendant also does not clearly and conspicuously disclose that packs automatically refill or expire, that Defendant charges the consumer's payment method on file for an additional pack, the amount of that additional charge, or how consumers avoid such additional charges.

48.     On this final page, only in small, inconspicuous font, and below the "Complete Checkout" button, Shutterstock's license agreement, and the cost and size of the pack, does

Defendant disclose, "Downloads expire within a year of purchase. Your pack will automatically refill when all licenses are used" followed by a hyperlink, which consumers are not required to click before clicking the "Complete Checkout" button, to Defendant's Terms and Conditions. These disclosures are easy to overlook as the text is smaller, and less distinct, than the brightly colored buttons that Defendant uses to prompt consumers to navigate this page and complete enrollment. Thus, consumers can, and do, purchase Defendant's "one-time" packs without ever reading these disclosures.

49. Even if consumers click on the hyperlink to the Terms and Conditions, they will not find all material terms of Defendant's "one-time" packs, including that the packs automatically refill. Instead, to find any purported disclosures about automatic refills, consumers must scroll to the very last sentence of the more than 6,000 word terms document, which states, "For packs, an order refill will also be triggered by your use of all assets in the pack (e.g., when you download all 5 assets in a 5-pack). To cancel, please visit the Plans page." This disclosure introduced another new term, "assets," for what was originally referred to as "downloads" and subsequently referred to as "licenses." The use of inconsistent terminology across its various disclosures is confusing. This inadequate disclosure also provides incorrect instructions on how to turn off automatic refill. Customers who do not wish to have their packs automatically refill need to turn off automatic refill, not "cancel" automatic refill, making this purported disclosure confusing. The disclosure also does not inform consumers that they need to turn off automatic refill prior to using their last download if they do not want to be rebilled.

50. Nor does this disclosure meaningfully explain that Defendant will charge the consumer's billing information on file for another pack automatically upon the consumer

19

downloading their last piece of content or provide the amount of such a charge. The Terms and Conditions also fail to disclose that the downloads expire after one year.

51.    Many consumers are surprised when they use their pack and are immediately charged again for another pack. For example, one consumer complained, "I was under the impression I had purchased a 2 image pack. Since then I have downloaded 2 images. I don't understand why I now have an additional $20 charged to my bank account. Please provide information on this matter, as I did not make this purchase." Consumers are even more frustrated when they reach out to customer service to obtain a refund and are met with resistance from customer support agents.

52.     Defendant is aware that consumers do not know packs automatically refill, and that consumers have been unaware packs automatically renewed. Defendant's Senior Director of Product Management told the Head of Growth and Strategy that the "auto[matic] refill thing does not feel good at all from a [user experience] perspective … [b]ut we also get it, it's gotta be done." The Head of Growth and Strategy pushed for automatic refill to be the default because "the only way to get the most money out of the guy that only buys a 1 time [on demand 2 pack] is to get him to use it so that I charge him again to refill him on that [pack] (turning $30 into $60 and so on)."

**C.  Defendant's Deceptive Free Trial Advertising and Enrollment**

53.    From at least 2021 until at least January 2024, Defendant offered a one-month free trial of its subscriptions, including, at various times, its APM 10 image plan and the APM Flex plan, which allowed consumers to download images, videos, and music on one plan. Defendant led consumers into signing up for their free trials through advertisements stating, "Get 10 free images from Shutterstock." See Figure 8.



Figure 8

54.    In advertising free trials, Defendant did not disclose their material terms. In particular, Defendant did not disclose that it would automatically convert the free trial into an annual recurring subscription that came with a hefty fee to cancel if the consumer did not cancel their subscription before the trial period ended.

55.    The enrollment process for the free trial was similar to the enrollment process for the APM plan as described above. In particular, Defendant obtained consumers' billing information before disclosing material terms, including the APM plan's cancellation fee and annual renewal. Then after obtaining consumers' billing information, Defendant did not clearly and conspicuously disclose these material terms. As a result, at the time consumers entered the transaction, consumers did not know that their free trial would convert to an automatically renewing annual plan, that the plan was subject to a cancellation fee, or how much the cancellation fee was.

56.     Defendant's deceptive promotion of simple free trials, like its deceptive promotion of the monthly features of APM plans, results in confusion about the APM plans to which Defendant converts consumers after their free trial period ends.

57.     Consumers whose free trial converted to the APM plan have frequently complained that they were surprised by the hefty cancellation fee when they attempted to cancel their subscription. Despite employees' suggestions to send reminder emails about the end of a consumer's free trial period, Defendant declined to send these reminder emails.

58.     Many consumers who signed up for a free trial have found themselves in a subscription they neither wanted nor assented to. One consumer complained to the BBB that defendant "secretly billed my credit card $29/mo for 34 months without any email invoice or notification."

59.     Defendant routinely reviewed surveys from dissatisfied consumers who reported they felt deceived by Defendant's conversion of free trials to APM plans and categorized these surveys into general themes. One of these themes was "[u]nclear/dishonest advertising" for the free trial. Despite this knowledge, Defendant continued to market the free trial deceptively for years.

### III.     Defendant's Unlawful Cancellation Practices

60.     Whether a consumer enrolls in a free trial or a paid subscription, Defendant has instituted a cancellation process that is difficult, burdensome, and time-consuming.

61.     Beginning in January 2024, Defendant made online cancellation available to APM plan subscribers who wished to cancel early. Previously, Defendant did not allow online cancellation and instead required consumers to either submit a request through the cancellation flow and wait for a follow-up email from Defendant, or contact customer support by phone,

22

email, or chat to begin the process of canceling their APM plans. During this time, Defendant did not provide online cancellation despite knowing that the inability to cancel online was something customers "complained about for years" and that customers "were frustrated with the enforced friction contacting support created for them."

62.    Defendant's phone and chat cancellation options were not simple. For phone cancellation, many consumers cannot reach Defendant because Defendant has listed the wrong customer service phone number multiple times on its website, including seven times in its Terms of Service. Consumers who call the customer service number listed in the Terms of Service receive an automated message that the number is no longer in service.

63.     Consumers who manage to reach Defendant by phone or chat have reported long wait times and frequent disconnections. For example, from June 2023 to July 2024, the average call abandonment rate was 21.1%. The average chat abandonment rate from September 2023 to August 2024 was 13.34%. The median chat resolution time from September 2023 to August 2024 was over 11 minutes.

64.    If a consumer reaches a customer service representative either by phone or chat, they encounter a process rife with tactics that impede their attempt to cancel. These tactics result in a multi-step cancellation process that, combined with the difficult-to-locate customer service telephone number and the long wait times, is not simple.

65.    Defendant does not honor cancellation requests by email but instead requires consumers to navigate multiple follow-up emails. A consumer who emails to cancel must wait for an email response from Defendant. When Defendant does respond, it often touts the benefits the consumer was receiving by enrolling in an annual commitment, a detailed breakdown of the early cancellation fee, and how it is calculated.

66.     Paying Defendant's cancellation fee requires consumers to take additional steps to actually cancel their subscription. At times, consumers have needed to send a second email granting permission for Defendant to charge them the early cancellation fee. At other times, Defendant has provided a link in the responsive email, which the consumer had to click to consent to the early cancellation fee.

67.     This link has required customers to take still more steps. Defendant has required consumers to click this link within three days. Customers could easily miss this deadline because Defendant's email can be routed to junk mail or consumers are not expecting a reply that will require additional steps to cancel. Consumers who click the link in Defendant's email were brought to a payment portal to pay the early termination fee. At times during the relevant period, Defendant provided text in the email referring to the payment portal link but failed to provide a link. Defendant's error would then require consumers to email Defendant again, restarting the process.

68.     Since introducing online cancellation for APM plans in January 2024, the primary purpose of Defendant's cancellation process has not been to enable subscribers to cancel, but to discourage them. Defendant has required consumers to navigate a series of at least eight screens and ten clicks designed to frustrate cancellations.  And the eight screens and ten clicks assumes that consumers seeking to cancel make the correct choice at every stage; if not, cancellation takes even longer or is impossible.

69.     To cancel an APM plan, consumers must first navigate to the account profile page and locate the "Plans" page under "My Account." On the "Plans" page, the second page in the process, consumers must then locate an inconspicuous black and white button labeled, "Cancel

plan." But clicking this button does not in fact cancel anything. Instead, it begins a convoluted process requiring several additional steps, most of which are wholly unnecessary and deceptive.

70.    After clicking "Cancel plan," consumers are brought to the third of eight pages in the cancellation process where they are forced to answer a survey question about why they want to cancel their membership. Consumers are required to select one of three options and each of those three options contains an additional drop-down menu of choices that customers must also select from to proceed. See, for example, Figure 11 below.



Figure 11

71.    After answering the survey question, consumers must locate and click a button labeled "Continue to cancel." Clicking this button, again, does not cancel anything. Instead, Defendant takes consumers to a fourth, "value proposition" page, where Defendant dissuades them from canceling by touting the benefits of a subscription. On this page, Defendant asks the consumer, "Did you know your plan includes more than stock assets?" This page encourages the

customer to click on a brightly colored button labeled, "One click editing." If clicked, the link in that button navigates the consumer away from the cancellation flow without canceling.



Figure 12

72.    Below the brightly colored button is a smaller, inconspicuous button that reads "Continue to cancel plan." The consumer who wishes to cancel must click this button. However, clicking "Continue to cancel plan," still does not cancel anything. Instead, Defendant brings the consumer to the fifth page in the cancellation flow.

73.    On the fifth page, consumers are presented with an offer to "roll over" any remaining downloads to the next month, meaning that consumers can use any unused downloads that were set to expire for another month if they continue with their subscription. Once again, Defendant presents consumers with a prominent button that will accept this "roll over" offer.

26

However, Defendant does not disclose that accepting this offer will remove the user from the cancellation flow without effectuating cancellation. Consumers who wish to cancel must, once again, click on a less conspicuous button labeled "Continue to cancel plan." But consumers who click on this button, once again, have not successfully canceled.

74.    Instead, Defendant navigates such consumers to a sixth page, which presents yet another retention offer giving the consumer the option to pause their subscription for one or two months. The prominent button on this page is the option to pause the consumer's subscription which will remove the user from the cancellation flow without effectuating cancellation. Consumers who wish to cancel must find and click on the button labeled "Continue to cancel plan." But consumers who click on this button still have not canceled their plan.

75.    Instead, consumers who reject both of Defendant's retention offers are then taken to the seventh page in the cancellation process, which presents them with the option to "Cancel at end of term" (which really refers to turning off automatic renewal) or "Cancel Early." This page is often confusing to consumers who are not aware of the difference between automatic renewal and canceling early because they were not aware they signed up for an annual subscription, *i.e.*, consumers were unaware that their initial purchase would automatically renew, much less that a fee was required to cancel. Under the option to cancel early, Defendant shows the cancellation fee calculation. As shown in Figure 13, Defendant makes the button to turn off automatic renewal the most prominent button on the seventh page of the cancellation process, which in many instances is more profitable for Defendant than allowing consumers to continue to cancellation.



Figure 13

76.      It is on this seventh page that many consumers learn for the first time about the

cancellation fee and its amount, which is currently 50% of the remaining monthly fees in the

current year of the consumer's annual term. Defendant offers no way to dispute this charge using

the self-cancellation flow.  Subscribers have to either abandon their effort to cancel and continue

paying for a service they do not want or halt the online self-cancellation process and reach out to

customer service (provided they can even reach someone) to discuss or dispute the fee.

77.      If the consumer continues notwithstanding the fee, they are finally taken to the

eighth page of the cancellation flow which confirms their cancellation.

78.      At no point in its cancellation flow does Defendant offer consumers the

opportunity to bypass the flow or cancel without navigating the remaining screens in the flow.

Nor does Defendant indicate to consumers how long the flow is, or where consumers are within the flow at any moment.

79. Defendant knows that many consumers have been impeded from easily canceling. Indeed, Defendant has designed and evaluated its cancellation procedures partly with the goal of preventing cancellations and maximizing customer retention.

80. Most subscribers learn for the first time about the early cancellation fee—and its amount—during cancellation.

81. Throughout the applicable time period, Defendant's employees have regularly discussed widespread consumer confusion and anger regarding the early cancellation fee and the automatic refill of packs. This includes employees acknowledging that its enrollment flow disclosures were not transparent.

82. Defendant's employees, including senior management and executive officers, also shared numerous articles about and discussed the U.S. Department of Justice's June 2024 lawsuit against Defendant's competitor Adobe for similar practices that allegedly violated ROSCA.

83. For example, the month the lawsuit was filed, a software engineer shared an article from the Verge titled "US sues Adobe for 'deceiving' subscriptions that are too hard to cancel," in a Slack message with over 60 recipients, including Defendant's Chief Product Officer. The Head of Growth for one of Defendant's music brands responded to the article stating that Defendant's "Legal team is well-versed on these happenings and partners with SSTK Growth/Product etc. to navigate." When another employee referenced the Adobe lawsuit and that Defendant would "be next," a Senior Product Manager who is now the Director of Product, wrote, "[H]opefully we can get away with it." In that same conversation, Defendant's employees

acknowledge difficulties in canceling Shutterstock's subscriptions prior to the implementation of online cancellation.

84. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate laws enforced by the Commission because, among other things: Defendant has engaged in unlawful acts and practices continuously over a period of several years; Defendant has continued its unlawful acts or practices despite the knowledge of thousands of consumer complaints; Defendant's senior level employees regularly discussed widespread consumer confusion about Defendant's unlawful practices; Defendant remains in the business of selling negative option products and services; Defendant continues to engage in practices even after learning of a federal enforcement action alleging that similar practices violated ROSCA; and Defendant maintains the means, ability, and incentive to continue its unlawful conduct.

## VIOLATIONS OF THE FTC ACT

85. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

86. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## COUNT I

*Section 5 Misrepresentation – Packs*

87. As described in Paragraphs 37-52 above, in connection with the advertising, marketing, promotion, offering for sale, or sale of specified quantities of licensed content, Defendant has represented directly or indirectly, expressly or by implication, that the packs are a one-time purchase.

88.    In fact, when Defendant has made the representations described in Paragraph 87, the packs are not a one-time purchase, and consumers who purchase the packs are enrolled in a subscription through a negative option feature.

89.    Therefore, Defendant's representations as described in Paragraph 87, are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT**

90.    In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

91.    Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller: (a) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information; (b) obtains the consumer's express informed consent before making the charge; and (c) provides simple mechanisms to stop recurring charges. *See* 15 U.S.C. § 8403.

92.    The TSR defines a negative option feature as: "in an offer or agreement to sell or provide any goods or services, a provision under which the consumer's silence or failure to take

an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

93.     Defendant has created and manages several negative option features as defined by the TSR, 16 C.F.R. § 310.2(w), including subscriptions for products and services including the monthly, annual billed monthly, annual paid upfront, and image pack plans.

94.     Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404(a), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of ROSCA shall be treated as a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a, and therefore a violation of ROSCA constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**COUNT II**

*Failure to Clearly and Conspicuously Disclose Material Terms*
*Before Obtaining Billing Information*

95.     In connection with charging or attempting to charge consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendant has failed to (a) timely disclose material terms of the transaction, clearly and conspicuously, before obtaining the consumer's billing information, as described in Paragraphs 18-59 above; and (b) clearly and conspicuously disclose material terms of the transaction including, for example, the APM plans', APU plans', packs', and free trials' billing and renewal terms, including when consumers will be billed, the length of the subscription, what cancellation fees will apply and when, and the amount of those fees, as described in Paragraphs 18-59 above.

96.     Defendant's practices as described above in Paragraph 95, violate Section 4 of ROSCA, 15 U.S.C. § 8403, and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

32

## COUNT III

*Failure to Obtain Express Informed Consent*

97. As described in Paragraphs 18-59 above, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendant has failed to obtain the consumer's express informed consent before charging the consumer's credit card, debit card, bank account, or other financial account for the transaction.

98. Defendant's practices as described above in Paragraph 97, violate Section 4 of ROSCA, 15 U.S.C. § 8403, and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

*Failure to Provide Simple Cancellation Mechanisms*

99. As described in Paragraphs 60-80 above, in connection with charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, Defendant has failed to provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account, or other financial account.

100. Defendant's practices as described above in Paragraph 99, violate Section 4 of ROSCA, 15 U.S.C. § 8403, and therefore constitute unfair or deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**CONSUMER INJURY**

101.    Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

**PRAYER FOR RELIEF**

102.    Wherefore, the FTC requests that the Court:

A.    Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA;

B.    Award monetary and other relief within the Court's power to grant; and

C.    Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated:  May 13, 2026

`

_____
Nicole G. H. Conte (Virginia Bar No. 91552)
Edward Hynes (NY Bar No. 4887584)
1999 Bryan Street, Suite 2150
Dallas, Texas 75201
202-285-0062 (Conte)
202-340-7388 (Hynes)
nconte@ftc.gov
ehynes@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION